CRESSLER *v.* KING PAPER CO.

MASTER AND SERVANT—NEGLIGENCE—PROTECTING GEARS AND MACHINERY.

Evidence tending to show that plaintiff's decedent was caught on a revolving shaft, upon which he was making repairs, that one of the pins or keys on the shaft projected, but not showing what his clothing caught on, and testimony that he could have had the machinery stopped while he was adjusting the gears, *held*, to warrant a directed verdict for defendant.

Error to Kalamazoo; Knappen, J. Submitted April

24, 1914. (Docket No. 123.) Decided July 24, 1914.

Case by Bertha Cressler, administratrix of the estate of Charles F. Cressler, deceased, against the King Paper Company for the negligent killing of decedent. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Thomas J. Cavanaugh* and *L. H. Titus,* for appellant.

*Fred L. Vandeveer* and *E. M. Irish,* for appellee.

MOORE, J. This action is brought by Bertha Cressler, administratrix of the estate of Charles Cressler, deceased, to recover damages for the death of her husband, caused by injuries received by him while in the employ of defendant. The trial judge directed a verdict in favor of the defendant. The case is brought here by writ of error.

Mr. Cressler was, at the time of his death, 31 years of age, a healthy man of good ability. His wife was employed in defendant's plant, and in her testimony described the character of his work as follows:

"Mr. Cressler started to work for the King Paper Company a little over a year before his death. I think his first work was installing machinery in the new part. He helped do that. That was before the mill was put in operation. I do not know how many months he was engaged in work of that character. As to whether he was placing overhead shafts or placing machines themselves, he was helping at a little bit of everything like that. I don't know how many men were engaged in installing the machinery, or how long he was so engaged. Approximately I would say probably about five months, and the balance after that was through he was transferred to the millwright gang. They repaired everything over the mill. They kept the machinery in repair after it had been installed, and, if it became necessary to install a new piece, the millwright gang would do it, and made repairs and

changes necessary throughout the entire plant, and at the time of his death he was doing work of that character, working with the millwright gang, and repairing and installing what new machinery was necessary."

Mr. Cressler was hurt at washer No. 2. Mr. Miller, a witness on the part of the plaintiff, testified in part as follows:

"There was a gearing on the main shaft at four points on the shaft. There was a gearing at five points at that time, and four of them were used to run washers with, and the other was motor driven. The gearing was fastened onto the shafting at the point called washer No. 2 with a key or a feather. Mr. Cressler was injured at washer No. 2. * * * The power is transmitted from the main shaft by gear to the machinery inside of the washer No. 2. The gears mesh. The feather pin or key at washer No. 2 is about nine inches long. There is nothing more than a key here and this feather pin to hold. The key bed is the same size as the feather pin itself. At washer No. 2 it is a 5-8 key, if it is standard. I should think it would be quite 5/16 of an inch above the shafting. Now in the gearing that went on there there was a core in the gearing to fit over the pin. Power was transmitted from this main shafting, this gearing to the washer itself by a larger gear meshed into the other one. There was a shaft that run from this gearing into the washing machine. The size of the gearing on the main shaft was about 10 inches, and the size of the gearing on the shafting that run into the washer was about 24, and at full speed the main shaft would make from 92 to 94 revolutions a minute. The gearing on the main shaft was fastened so as to keep it in place by the key or feather. I don't know whether there was anything to keep the gearing in mesh. There was a safety collar placed on the main shafting to keep the gearing in place. * * * At the time of the accident the gearing on washer No. 2 had got out of repair by stripping the teeth; that is, breaking off these cogs, the gearing on the main shaft. It was repaired by putting in peg teeth, as we call it, by smoothing the face up and drilling in and put in pegs, we call them. I was work-

ing for the King Paper Company on the 6th day of
July, 1911. Mr. Cressler was with me. I had known
him personally four or five months. He was on the
millwright gang. At the time I first knew him he
was working for the millwright gang on general re-
pairs—any old thing that breaks down, just repair
it, whether it was wood, iron, or lead. I first saw
him on the morning of July 6th at the machine shop
at the King Paper Mill at 7 o'clock in the morn-
ing. James Nerry was the foreman. He was
there. I had orders to finish the job that I left on
the 3d of July on the washers in the basement. Mr.
Nerry gave the orders that the work commenced
should be finished up. Mr. Cressler and I went down
in the basement about 10 minutes after 7 in the
morning. I went down to complete the job that I had
started, and Mr. Cressler went with me, and I put
on a gear that I had started to put on previously, and
when I got that on I had to fit a key, and Mr. Cress-
ler said, 'I will go and put the collar on.' I was work-
ing on washer 5 or 6, putting on a gear, and I had
to fit a key, and so he could not help me, and he said,
'I will go and put on the collar, Peter,' and while he
was putting on the collar I was fitting the key. I
got the key fitted perhaps at about the same time that
he got the collar on at No. 2, and he had the power
started by a Dutchman—I didn't know his name. He
had the fellow start up the power, and I could tell by
the sound that there was something wrong, and I
hollered down there to him. There was a space be-
tween the washer and the flooring above, just a plat-
form, and I looked down through there and asked him
if he broke off the pegs that were broken. He said,
'No.' I said 'You better break them off,' so he had
the power stopped, and he broke off what he could.
They were bent over, but not broke off entirely. The
guard was here, so he broke off down there what he
could see, and he told the Dutchman to start it up
again, turn it half over, and I looked down through,
and I saw that the fellow could not understand it, and
after he told him two or three times I said, 'Wait a
minute, and I will start it,' and I went down and
started it half over or quarter over, and he broke off
some more teeth, and when he got what he could he
told me to turn it over again until he got them all

broke off, and he says, 'It's all right, Peter, let her go,' and I said, 'Is it all right?' and he said, 'Yes.' Then we always holler before we start anything that is going around, and I hollered, 'It is going around.' He said, 'All right,' and I started it. I walked around then between Nos. 2 and 3 washer and stood looking at him, and there was something rattling, and he apparently reached over to take hold of the guard or something, I don't know what. I saw his clothes were tearing off, and I ran to the motor and shut it down. When I came back he was laying partly across the shaft. The shaft was about here. He was hanging on the shaft. The guard over the bearings I spoke of was simply made of ordinary sheet iron, simply comes up over this one and this one.  *  *  *  After I stopped the motor I came back to the washer where Mr. Cressler was and began to cut him off the shaft and took him out with help. I did not see him revolving around the shaft. I am not positive whether I went to the washer again the next day or the next but one. I did not go in particular to make an examination of the gearing and feather pin. I did go where it was. I discovered a cold chisel mark and the feather pin extended out beyond the gearing and the covering two or three or four inches. I am not positive about that. The cold chisel mark had the appearance of taking a cold chisel, and apparently trying to drive the key out that had made a little burr in there that extended up. I could not say how deep it was in the feather pin, or how high it raised above the feather pin. It was out towards the end of the feather. The feather pin is made of steel—key steel we call it. It is 5-8 square. I think this one was nine inches in the shaft."

On the cross-examination he testified in part:

"It was the duty of the millwrights to make such repairs and changes in the machinery as was necessary to keep that machinery in motion in order that paper could be turned out, and especially so far as handling the machinery, which was constantly in motion, such as shafting, the bearings that hold the shafting, gearing, belting, hangings, standards, etc.; and, if it became necessary to change the pieces of machinery from one part of the plant to another, the

millwright gang would do that. And if a new piece of machinery was brought in, they would set it and place it and connect it up. And if a piece of machinery would break down, it would be reported to the foreman of the millwright gang, and the foreman would immediately send one of his men, so that the manufacturing might continue. And likewise if it became necessary to place a guard over a piece of machinery, that also was a part of the millwright's work. I do not know who it was that placed the guards over the gears back of this battery of washers where Mr. Cressler was injured.  *  *  *  I would not say where the light was; but there was plenty of light in there. Now, in the event of it becoming necessary for millwrights to go into a place where they could not see, candles were not furnished us, nor lanterns; but we had a cord that could be fastened to a socket to bring an electric light to us furnished by the King Paper Company as a part of our kit or equipment. I am not positive whether there was a sufficient amount of light there so it wasn't necessary to use the extension. If necessary to use an extension, you could easily have made it.  *  *  *  The millwright is supposed to do all the repairing on the machinery, as I understand it. I said it looked to me as though a cold chisel had caused the small burr extending up by taking a chisel and hammer and driving the key out. I would not be positive how that would be caused. It looked as though it were toward the end, and had been caused when they were driving a chisel against the feather pin for the purpose of removing it, and the man who would do that would be apparently the fellow-servant of the millwright man.  There was a sheet iron guard over these gears which covered the point of where they were meshed.  *  *  *  He was between the shaft and the wall. It appeared to me that he was caught while reaching over like that (indicating) to make some adjustments. That is the way I saw it with his hand extended across and just above the main shaft. There was nothing that would have prevented him from requesting me to stop that shaft while he was making the adjustment. If he had wanted to, he could have asked me to stop that shaft while he was making the adjustment. It would have been possible for him to

have gone to the other side of the shaft, that is, on the west side, and make the adjustment and been in such a position that this arm would not have been over the shaft and extended across it. But instead of that he stood in such a position that he had to put his hand above the shaft and across it. I helped remove him from the shaft. I cannot state at what point on the shaft his clothes first became engaged, and I don't know whether it was caught in the gearing, nor any part of the feather pin, nor on the shaft some distance from the exposed end of the feather key. It is my understanding that the shaft was running at the rate of 92 revolutions per minute—92 or 94; that is what it runs regularly, and I think that it had speeded up to that many revolutions per minute at the time he was caught. When it was running at that speed you could still see the feather pin if you were looking for it. I don't know whether in my kit of tools I carried a file. They were files that I could get if I desired that could be used in the event there was a burr on the feather pin in smoothing it out. I don't know which one of the millwrights left it there. I don't know whether it was one of the other millwrights or the deceased. Up to that time deceased was the last one that worked on the feather pin in setting the collar over it. I don't know whether, if there had been a defect in that feather pin, or it was out of order, it would have been his job before leaving the work to put it in order."

Mr. Dexter, a witness for plaintiff, testified, among other things, that on Sunday, July 2d, he helped put on a new pinion gear at washer No. 2, which was run but two days when the accident happened, July 6th.

"We used a torch for light, and we put the torch close to the gears. I don't know whether on that Sunday there was a burr on that feather pin. I didn't see any. I was working around it, and I had to use my hands in slipping this pinion gear over the feather key, and I didn't notice one at that time. If there had been, and I was looking for it, I could have seen it and felt it, because the torch gave sufficient light. I said I didn't have any recollection of seeing any such burr. I don't remember using a cold chisel or ham-

mer. I have had occasion to use a cold chisel on a feather pin and raise a burr on it. Probably I would file it down. It would be the proper course to pursue. The accident happened in the morning, and I went down the middle of the afternoon to make the inspection. There is generally a good deal of water down there—moisture. The condition of the burr indicated that it was old, because there was some rust on it. I could not say whether it had rusted in two hours' time or eight or twenty-four. I know rust forms quickly on iron. I don't know positively whether that cut or that burr was made by Mr. Cressler in the morning and rusted between the time that he made it and I examined it in the afternoon, and I don't know positively whether, when I left work there on Sunday, July 2d, there was no burr that I saw or had made on the feather key. I don't know of any one else working on the gear at washer No. 2 between the time that we did the work on Sunday and the time Mr. Cressler was injured."

Mr. De Vries was a witness for the plaintiff, who helped Mr. Dexter put on the new gear on the Sunday before the accident. He testified in part:

"I was told to help Mr. Dexter put that gear on. He was apparently in charge of the work; but that never made much difference because we two men went down there and knew what the job was, and we both lent a hand and got it done. He said, for instance, 'De Vries, you do this,' and I would do it, and I might say, 'Dexter, you do that.' In other words, we worked together. I would not say the electric lights were burning the Sunday that we put the pinion gear on. I know I had a torch, and it was placed where we could see best. Before we put on the pinion gear we had to take the old one off, and that left the feather pin exposed for nearly its full length of nine inches, and after we removed it we went to work and slipped the other one out. When we slipped the new pinion on, we had to adjust it so that a groove in the hub of the pinion would fit over the feather key, and the feather key is the thing that held the pinion gear tight to the shaft, so that when the shaft revolved it would cause the pinion gear to revolve with it, so

that I had opportunity at that time to see the feather pin. And in making the adjustment of the pinion gear to the pin, my attention was directed directly and particularly to the feather pin. My light may have been close to it, and it may have been a foot or two away. If we have a torch, of course we put it where we can see best. I did not, that I know of, have to make any adjustment of the feather pin. I did not notice at that time any burr on the feather pin. I did not put a cold chisel against the feather pin and drive on it with a hammer. After the work was completed we did not make a test to see if the gears were running properly—we couldn't, and after the work was done the machinery was run on Wednesday. We did not run Tuesday because it was the 4th of July. I heard Mr. Dexter's testimony that he did not put a cold chisel on the feather pin and strike it with a hammer. I didn't and when we left the job I did not notice any burr on the feather pin. If I had seen one there, I would have filed it off."

We have quoted perhaps more than was necessary from the testimony, because the case of the plaintiff is based upon the theory that the projection on the feather pin caused the injury, and that the feather pin as well as the gears should have been covered by a guard. It is clear from the testimony that what caused the injury is a matter of conjecture. A new gear was put in on the Sunday before the accident. At that time the workman saw nothing wrong with the feather pin. The gear got out of order so it needed repairs on the following Wednesday morning. Mr. Cressler, whose duty it was to do that sort of work, was sent to put it in repair. Whether he cut the projection on the feather pin no one knows. The record does not disclose that any one else did it. After making his repairs, he caused the machinery to be put in motion. He found it necessary to adjust the guard over the gears to prevent them from rubbing on the gear. Upon the request of Mr. Cressler, Mr. Miller would have stopped the machinery. Mr. Cressler evi-

dently did not think this was necessary. He reached over to make the adjustment, with the result which has already been stated. No one knows upon what his clothing caught.

We think the trial judge was right in directing a verdict. See Baldwin on Personal Injuries, § 357; *Sakol* v. *Rickel*, 113 Mich. 476 (71 N. W. 833) ; *Perlick* v. *Woodenware Co.*, 119 Mich. 331 (78 N. W. 127) ; *Van Wyck* v. *Dickinson*, 148 Mich. 418 (111 N. W. 1033) ; *Neifert* v. *Metler*, 165 Mich. 354 (130 N. W. 630).

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.