BROUDY *v.* DETROIT, JACKSON & CHICAGO RAILWAY.

1. ELECTRICITY—EVIDENCE—DEATH—NEGLIGENCE.

   Evidence tending to show that decedent was killed by a current of electricity which passed over a telephone wire in the street which had fallen after a severe storm and that only certain currents of sufficient capacity to cause death were in operation in the city at that time, *held,* insufficient to show that the cause of death was the high tension wire of the defendant.

2. SAME—TRIAL—DIRECTED VERDICT.
Where the evidence failed to show that defendant's current was the only deadly one in the city at the time of the accident or that defendant's trolley wire actually came in contact or connection with the telephone wire which was down, and where the most which could be said of the testimony introduced in plaintiff's behalf was that the accident might have occurred in the way alleged, plaintiff did not satisfy the burden of proof resting upon him to show negligence and the trial court did not err in directing a verdict for defendant.

Error to Washtenaw; Kinne, J. Submitted November 6, 1914. (Docket No. 147.) Decided March 17, 1915.

Case by Lena Broudy as administratrix of the estate of Jacob Broudy, deceased, against the Detroit, Jackson & Chicago Railway, for the wrongful killing of decedent. Judgment for defendant upon a directed verdict. Plaintiff brings error. Affirmed.

*Arthur E. Fixel* and *Max H. Finkelston,* for appellant.

*Cavanaugh & Burke,* for appellee.

On the 4th day of June, 1911, at about 7:45 in the evening, a very severe wind and rain storm struck the city of Ypsilanti. It lasted an hour or more, and did a great deal of damage in and about said city. Trees were uprooted, and poles carrying wires were thrown down. At exactly what period of the storm the heaviest wind came is not disclosed, although it seems certain that the three heavy gusts described by one witness occurred in the earlier part of the disturbance. The plaintiff's intestate, a man about 45 years of age, lived at the corner of Spring and Bell streets in said city with his family. After the first fury of the storm had spent itself, he became concerned for the safety of two of his boys, about 10 and 12 years

of age, who seem to have been at a store about a block distant from his residence during the storm. He, in company with a neighbor named Wiard, started out to find the children. The city was at that time in total darkness. Wiard testified:

"I walked along with him. He was looking for his boys—his two children. I went to the store with him, and then went from there over to Mrs. Donahue's, and from there to the barn, and was looking after the horses, and was looking around to see what damage I had, and there I heard the screaming. When I walked with him he was on the sidewalk on the south side of Spring street. I came out from my house down the sidewalk. We walked down together. I live on Spring street. He lives across the road, on the opposite corner. He came out across the road to my house. We both walked over, and as we walked I saw these wires down. He came right under the wire. I called his attention to the fact. I said that was a live wire, and to be careful; 'Be careful when you go back.' * * * You couldn't see the wire. It was dark. You could see flashing up there once in a while. It wasn't flashing as much as it had been. I told him to look out for it on the way back. * * * I said: 'Look out for wires, for they are alive.'"

On the way back from the store to his residence plaintiff's intestate came in contact with a telephone wire hanging in the street at the corner of Spring and Bell streets. His son, who was with him, and was then 13 years old, testified as follows:

"When we got to the corner of Spring and Bell streets we were just going to turn around and go into our house, right there by the door. We knew there was a wire there, but we did not know where it was. We were trying to look out for it. I was walking back, and my brother was walking with my father. My father fell. He fell on his side. He cried out three times. It was all done in a second. The next thing I saw him fall. I was going to pick him up. I took hold of his coat, but it was a wire. I got such a shock that I had to let go. I screamed and my mother came out. I pulled my little brother off."

Plaintiff, as administratix of the estate of her dead husband, filed a declaration originally charging the defendant and the Eastern Michigan Edison Company with negligence, which she claimed caused the death of her intestate. Before the trial she discontinued as to Eastern Michigan Edison Company, and the case went to trial against the Detroit, Jackson & Chicago Railway alone.

The plaintiff introduced evidence tending to establish the fact that the Eastern Michigan Edison Company had a service system in operation in the city of Ypsilanti, the wires of which carried 2,300 volts from the transformer. There was also a high-tension wire running through the city carrying perhaps 20,000 volts. It does not appear whether this high-tension wire was a part of the system of the Eastern Michigan Edison Company plant or not, although, presumedly, it was. Plaintiff also showed by the engineer of the municipal plant for furnishing water and light to the city of Ypsilanti that that concern had a system of wires for municipal light throughout the city which carried from 900 to 2,300 volts. Evidence was also introduced on behalf of plaintiff tending to show that the defendant railway company, upon its trolley line running through the city, carried a voltage of between 500 and 600. The record further shows that at some time during the storm the trolley wire of the defendant company was blown down, and was lying upon the street, in Washington street, about a block distant from the power house of the defendant, and where it struck the ground flashes of electricity were seen. Such electrical displays were also observed in the streets at different points in the city. The corner of Spring and Bell streets is distant about one-half mile from the point where defendant's trolley wire was upon the ground. It was the theory of the plaintiff that defendant's trolley wire had in some way come

in contact with the city lighting wires which passed the corner of Spring and Bell streets, and the telephone wire which had likewise been blown down at that point received the railway company's current through said telephone wire and said lighting company wire, from the trolley wire which was on the ground a half mile distant. In order to support this testimony the plaintiff endeavored to show that all other sources of electrical current were eliminated at the time the accident occurred. The moment of the death of plaintiff's intestate seems to be definitely fixed by several witnesses at 8:50 p. m. The engineer of the lighting plant testified:

"After the power started to flash up I shut it right down. It cut off all the street lighting in Ypsilanti. I fix the time at some time between 7 and 9 o'clock.

"*Q.* After you turned that power off was there any other power turned on that evening that would furnish light in Ypsilanti in the arcs?

"*A.* No light at all; as soon as the pumps were turned off there was no power connected with the lights that night. I was too busy about that time to look at the clock to fix the time.

"*Q.* To definitely fix the time that you turned it off, was it storming?

"*A.* I was too busy about that time to look at the clock."

William D. Miller, superintendent of the Eastern Michigan Edison Company at Ypsilanti, on direct examination testified:

"*Q.* What happened to the Edison power, did it continue that night; or was it injured?

"*A.* No, sir; it was injured; it was interrupted.

"*Q.* Or was it cut off?

"*A.* It was cut off; yes, sir.

"*Q.* Did that take place when the heavy wind came that caused the damage around Ypsilanti?

"*A.* It did; yes, sir.

"*Q.* Did the Edison Company have any light power

in the city of Ypsilanti after their system got out of order?

"*A.* None whatever.

"*Q.* What other power lighting wires are there, or other wires that carry electricity in the city of Ypsilanti, besides the Edison?

"*A.* The street railway company have power wires, and the city of Ypsilanti has a lighting circuit in the city.   *   *   *

"*Q.* Was there any other wiring around Ypsilanti except the Edison, the city lighting wires, the Detroit, Jackson & Chicago, the telephone and telegraph wires?

"*A.* No; none that I know of.

"*Q.* And were these all the companies that carried power in Ypsilanti?

"*A.* Yes.

"*Q.* Have you been over the lines on the different streets, so that your information would be correct, and you would know there was nothing injurious on the streets of Ypsilanti?

"*A.* Well, there might be something brought through and constructed in the city of Ypsilanti that would not come to my attention; yes. I never looked over Ypsilanti to see whether there was anything there injurious or not, but I don't think there was."

On cross-examination he testified in part as follows:

"I never had anything to do with telephone and telegraph wires in the line part of it. I have heard of men being killed working on telephone and telegraph wires. I would not consider the conditions were normal then. I know of instances where men were killed by telephone and telegraph wires. The substation of the Edison plant is north and west of Ypsilanti. The only wire we had on this street was a wire crossing the street between Ellis and Pearl. There may have been another line crossing Washington and Emmet street. I am not quite certain. I made no statement that there were lights burning in the city of Ypsilanti after the storm. The question was not asked me. Those are not high-tension wires that I am speaking of that come into the city of Ypsilanti. I have not been speaking of high-tension wires, of anything above 2,300. I don't know from my own

knowledge anything about the power that came into the wires at Ann street through the transformer. I only knew the reports that were handed in. I was not beyond the transformer house myself. I don't know anything beyond the transformer house of my own knowledge. High-tension wires follow right along with the telephone and telegraph wires. They follow probably within 60 feet in places; in places it may be nearer. They carry very high voltage; perhaps 20,000. Our voltage is 2,300. After it leaves the transformer our voltage is 2,300. The voltage of the Detroit, Jackson & Chicago trolley is sometimes 500 to 600. I suppose it is from 500 to 600 voltage in order to run their cars. I do not know of my own knowledge whether the Edison high tension was on here in Ann Arbor. The size of the Edison wire that crossed Ellis street was No. 6, I think. The line that crossed Ellis street is only 220 volts, secondary. The transformer was on the west side of Washington street. The only other high-tension wires that passed through Ypsilanti besides those that come into the Edison transformer are the high-tension wires of the Detroit, Jackson & Chicago or the Detroit United Railway, which pass through Ypsilanti by way of the Huron river. Power was not furnished to the Detroit, Jackson & Chicago by the Eastern Michigan Edison Company at the time of the storm. It is now."

The contention is made on behalf of plaintiff that, under the foregoing testimony, it was conclusively proven that no current was abroad in the city of Ypsilanti except that carried by the defendant's trolley wire. It is urged that the shutting off of the power in the transformer station of the Edison Company eliminated the 2,300 volts used in their service system, and that the shutting off of the power in the municipal plant eliminated the 900 to 2,300 volts used in that system, and, although the engineer of the municipal plant was unable to fix the time when his power was shut off, it is argued, from the fact that the city was in darkness at the time of the accident, that that power must be eliminated.

At the conclusion of the plaintiff's case, defendant moved for a directed verdict upon the following grounds:

"(1) Because the declaration does not state a cause of action.

"(2) Because no negligence as charged in plaintiff's declaration has been proven.

"(3) Because there is no evidence that the electric current of the defendant passed over any other wire.

"(4) Because there is no evidence that the electric current of the defendant passed over the wire of the city's lighting wires.

"(5) Because it conclusively appears from the evidence that the plaintiff's intestate was killed in the south part of the town and a half mile away from where its wires were down.

"(6) Because there is no evidence that the wires of this defendant came in contact with any other wires, and there is no evidence that the electricity furnished by the defendant was communicated to the corner of Bell and Spring streets, in the city of Ypsilanti.

"(7) Because there has no evidence been introduced in this cause that the plaintiff was killed through any fault and negligence of the defendant.

"(8) Because there is no evidence to support a verdict against the defendant and in favor of the plaintiff under the pleadings."

The court granted the motion in the following language:

"It is lamentable that Mr. Broudy should have lost his life under such circumstances, but my view about it is that it is the act of wisdom to stop this case here, and, if there is any wish on the part of any interested to take this to the Supreme Court, I think that ought to be done before there is any other expense in this matter."

"Criticism has been made of the declaration in this case. Some of it may be just, but the matter that more particularly appeals to me is this: If I was compelled to submit this to the jury, it would be on the doctrine of chances and possibilities and probabilities. It does not seem to me as though that was the right

thing to do.  In this case it may be difficult to establish the proof as the plaintiff would like, but I think there should be some certainty in the evidence and proof before we call upon a man or a corporation to pay for the loss of such a life, and I think that the criticism that has been made on the proof is just.  It does not seem to me that the evidence justifies me in submitting to the jury the question whether or not there was any negligence on the part of the company which resulted in the death of this man.  I fail to see where the evidence is that they can take hold of and recognize as pointing to negligence on the part of the defendant company.  I think, under the circumstances, to hold this defendant liable for the death of this man would be unjust and in violation of legal principles, and I think I ought to direct a verdict for the defendant.

"A motion was made at the conclusion of the testimony on the part of the defendant looking to the proposition that the declaration is insufficient in this action, and that the proof fails to establish a case which ought to be submitted to the jury.  I am inclined to sustain that motion.  I have held, and now hold, that I don't think there is evidence in this case which justifies me in submitting this matter to the jury; and therefore, Mr. Clerk, you may take the verdict of the jury in favor of the defendant."

BROOKE, C. J. (*after stating the facts*).  A careful reading of the entire record in this case convinces us that the learned circuit judge reached a proper conclusion.  Considering the testimony introduced on behalf of plaintiff for the purpose of establishing the fact that the only lethal current abroad in the city of Ypsilanti at the moment of the death of plaintiff's intestate was that upon the trolley wire of the defendant company, we find that the record fails to disclose that the high-tension wire which carried about 20,000 volts was devoid of current at that time.  We further find that the engineer of the city lighting plant was unable to determine at what time the power of that plant was shut off.  He fixed it at somewhere

between 7 and 9 o'clock, and, as plaintiff's decedent received the deadly current at 10 minutes before 9, it is plain that, so far as this testimony proves anything, the city current might have been on at that time.

It is argued, on behalf of plaintiff, from the fact that the lights were extinguished at the time of the injury to plaintiff's intestate, that the municipal current must have been absent from those wires. There was testimony in the case, however, given by the plaintiff's witnesses that those wires might have carried current even though the lamps were unlighted. Indeed, if plaintiff's theory of the accident is correct, those wires must have carried the current from the defendant's trolley wire to the point where the accident occurred. The record likewise fails to show affirmatively that defendant's trolley wire actually came in contact with any other wire or wires at the point where it fell on Washington street. The witness Chadwick, speaking of defendant's trolley wire, on direct examination testified:

"*Q.* Did you observe flames when wires struck wires?

"*A.* Yes.

"*Q.* Did you observe that when a wire struck the rails?

"*A.* Yes; when wires struck rails it would flame up.

"*Q.* Did you see any wires burned in two?

"*A.* No; it was dark."

On cross-examination the same witness testified:

"*Q.* You don't know, of course, whether the wires came in contact with each other or not; all you know is that the wires fell down?

"*A.* When they crossed there would be a ball of fire strike up, and they would separate, and out it would go.

"*Q.* You don't know whether the wires crossed one another or not?

"*A.* I couldn't tell that. I know they were hitting

one another, or they would not make that display.  I couldn't tell what wires they were.

"Q. The city has more wires than one on that street?

"A. I couldn't say; I don't know.

"Q. You don't know what wires were in contact?

"A. No; I do not."

It would serve no purpose of value to the profession to set out at large the testimony contained in the record upon this point.  It is sufficient to say that, when given its greatest probative force, it falls short of showing affirmatively either one of two essentials: (1) That the defendant's current was the only deadly one upon any of the wires within the city of Ypsilanti at the time of the accident; or (2) that defendant's trolley wire actually came in contact with the city wire or any intermediate wire communicating with the city wire which carried the current a half mile distant to the corner of Spring and Bell streets, there to be communicated again to a telephone wire, which was down; thence to the plaintiff's intestate.  The most that can be said of the testimony introduced on behalf of plaintiff is that it is possible that all these contingencies occurred.  Under such circumstances, it is the duty of the court to direct a verdict for the defendant.

It is elementary that the burden is upon the plaintiff to establish by competent evidence not only the negligence of the defendant, but also to establish a direct connection between such negligence and the injury.  The plaintiff does not sustain such burden by showing that the injury may have resulted from the defendant's acts, but he must at least show that that fact follows as a reasonable inference from the basic facts and circumstances.  Whenever it is necessary to aid such proven basic facts and circumstances by conjecture, plaintiff must be held to have failed in his proof.  *Byerly* v. *Light, Power & Ice Co.,* 130 Mo.

App. 593 (109 S. W. 1065) ; and *Cressler* v. *Paper Co.,* 181 Mich. 422 (148 N. W. 176).

In this view of the case it becomes unnecessary to consider the evidence of defendant's negligence. It may be pointed out that nowhere in the record is it shown, even approximately, at what time defendant's trolley wire fell. It is therefore impossible to determine the lapse of time between the falling of the wire and the receipt of the injury by plaintiff's intestate, an element necessary upon which to base defendant's negligence upon the ground that it had constructive notice of the faulty and dangerous condition of its equipment. It is not shown that defendant had any actual notice of the condition prior to the happening of the accident.

The judgment is affirmed.

MCALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.