## ILLINOIS POWER & LIGHT CORPORATION v. HURLEY et al.

Circuit Court of Appeals, Eighth Circuit.
February 20, 1929.

No. 8246.

Thomas F. Doran, of Topeka, Kan. and E. Bentley Hamilton, of Peoria, Ill. (T. M. Pierce and Anderson, Gilbert & Wolfort, all of St. Louis, Mo., on the brief), for appellant.

906

Charles J. Dolan, of St. Louis, Mo. (John S. Leahy, T. J. Hoolan, and Leahy, Saunders & Walther, all of St. Louis, Mo., on the brief), for appellees.

Before KENYON, Circuit Judge, and JOHNSON and McDERMOTT, District Judges.

KENYON, Circuit Judge. Appellant, a corporation of the state of Illinois, is successor of the Madison County Light & Power Company (herein designated as the Power Company), which company supplied the Cain-Hurley Lumber Company, a Missouri corporation, operating a large lumber yard at Brooklyn, Ill., with electricity for the lighting and operation of its plant. This light and power was supplied through transformers stationed near a building on the property, and from which transformers the electricity passed to a meter board inside that part of the building known as the planing mill; and through the meter it was distributed throughout the plant. There were three railroad tracks either adjacent to or within the yard.

Appellees are the trustees of the Cain-Hurley Lumber Company (hereinafter designated as the lumber company), which has been dissolved since the fire. Early in the morning of February 23, 1922, a fire destroyed a large part of the plant of the lumber company. Suit was brought against appellant by appellees. A verdict was rendered by the jury for $120,000 damages, and judgment entered thereon.

The petition charged that "the said Madison County Light & Power Company carelessly and negligently caused, suffered and permitted its said wires and other electrical appliances and apparatuses, including its said bank of transformers to emit and discharge electric current, sparks, fire and flame, thereby setting fire to the plant and properties of the said Cain-Hurley Lumber Company."

■ Many assignments of error are presented. The only one necessary to be considered in our view of the case is in relation to the refusal of the court to direct a verdict for defendant at the close of all the evidence. Such motion was made at the close of plaintiffs' evidence, but defendant waived the same by proceeding to introduce its evidence.

■ Questions of fact are, of course, for the jury, and a court should not transgress on the jury's province, but the question of whether there is sufficient evidence to submit a case to the jury is a question of law. Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Dierks Lumber & Coal Co. v. Brown (C. C. A.) 19 F.(2d) 732.

■ From the evidence in this case it appears that the plant of the lumber company covered a large area (some four and one-half acres). The office was near the southwest corner of the property, some distance from the grain door mill and planing mill, which seems to have been one building with storage shed attached. A switch track passed through the premises adjacent to the grain door mill and planing mill. There was a loading platform along by the track. Large open spaces existed adjacent to the switch track for the piling of lumber. There was a lunchroom near the wagon road running through the yard, and other buildings in the nature of storage sheds and retail sheds were upon the premises. There were three transformers which, for the convenience of all parties, had been moved from their former location, and, at the time of the fire, were 18 to 24 inches from the grain door and planing mill. They rested on a wooden platform about 8 feet above the ground, which platform was fastened by bolts to two wooden poles. About 18 inches above the transformers there was a cross-arm supporting three fuse cut-outs. The primary wires leading to the transformers and meter board and the transformers were the property of the power company. The secondary wires leading from the meter board throughout the plant were the property of, and maintained by, the lumber company. The power company delivered the current over wires attached to the top of the poles, down through the fuse cut-outs and into the transformers, at 2,300 volts, and it came out of the transformers on the secondary side at 220 volts, which was the voltage used by the lumber company in the lighting and operation of its plant. There were plugs in each fuse cut-out which, if drawn, would prevent the passage of the current through the cut-outs. The primary coils of the three transformers were connected; also the secondary coils, completing what is termed by the experts, a delta connection, but there was no electrical connection between the primary and secondary coils. The heavy voltage passing through the primary coils induces a current in the secondary coils of much lower voltage. The mission of the transformer is the reduction of the voltage, and is brought about through the coils of insulated wires wrapped around a metal core within the transformer. It is

unnecessary to set forth in detail the technique of this process.

The night of the fire, February 23, 1922, was a dark, rainy, windy night. Witness Avara was the night watchman at the lumber plant. He carried a clock which had eleven keys in various places throughout the yard. When the key was turned in the clock it registered the time he was at the particular place. He visited every key once each hour through the night. When he came out of the office about 1 o'clock in the morning of the day of the fire he noticed a flash of light, and on investigation he found it was at an iron bolt on the north pole, to which the platform, upon which the transformers stood, was attached. He testified as follows:

"A. After I saw this light I went around this box car and went into the plant, and up on the north pole of this plant was a fire where the bolt had went through, that is this bolt to support the foundation that the transformer was setting on.

"Q. Where was that bolt? A. The bolt that was supporting the platform that the transformers were setting on, there was quite a blaze coming out from that bolt. There was fire burning into this pole. I would say the hole the fire had made in this pole was something like two inches in diameter and there was a blaze coming out of there perhaps six inches long, and I saw that something had to be done, and I went into the little room there, the tool room. I got a fire extinguisher."

After getting the fire extinguisher, he unloaded it on the flame. This had no effect whatever. He then phoned for the fire department at Brooklyn, but did not succeed in getting it, and then endeavored to get another fire department. He told one of the firemen over the phone the nature of the trouble, and the fireman informed him that he needed an electrician instead of a fire department. After this, he called the superintendent of the plant, Mr. Royals, who came over to the plant in about 30 minutes, and they got Harry Dreams, a colored employee, who operated the lunchroom, to help. Dreams put a ladder up on the pole where the fire was; went up, and, at the direction of Royals, pulled out a fuse plug, and the fire went out. At about that time an electrician of the power company (Anderson) came, and a couple more men as helpers, and Avara continued on his rounds for the rest of the night, seeing no more fire until morning, although he on his rounds was within 30 to 35 feet of these transformers every hour.

The witness Dreams testified as to Avara and Royals awakening him about midnight and as to his going up the ladder and pulling the fuse. He noticed the fire as he passed up the pole, and, when he came back after pulling the fuse, he did not see any fire; that Anderson with his two helpers came about the time he pulled the fuse plug. They put on what is termed a jumper, that is, the wires on each side of the fuse box were cut, and a new wire was put around the fuse box, thus eliminating entirely the fuse box where the leak existed. The function of this operation was to carry the current around the fuse box and preserve its continuity. The current would continue to go into the transformers, but would pass over the jumper and not through the fuse cut-out. As a test as to whether the transformers were operating properly, the nearest 3-phase motor in the building to the transformers was turned on, and it operated all right. Dreams testified that Anderson told Royals at the office that night when talking over the situation that the transformer was shot, and that he could not examine the job that night on account of the weather, but had fixed it temporarily, and would be back the following day and give permanent relief, but that everything was all right, and they could run the plant.

Royals testified to practically the same thing as Dreams concerning the pulling of the fuse plug, and that the fire disappeared immediately thereafter, and also that Anderson told him the transformer was shot. He testified that, when he first saw the flame about midnight, it "was running up and down the pole," and "was between the platform that separates the three transformers and the cross-arm above;" that the only flame he saw was the blue flame on the pole; that ceased when the fuse plug was pulled. It is without question that there was a heavy rain through the night, continuing until about 4 o'clock; that at about 6 o'clock in the morning Mrs. Dreams came running down to the office and announced that the planing mill was on fire. The lights had been on in the office from the time of the repairs until a little while before the alarm was sounded. Witnesses testified that shortly before the fire lights in the office, which were a part of the lighting system of the yard, would go off and then on, and that just a few minutes before the alarm the lights went out in the office and did not come back. No investigation was made as to why the lights went out. No witness puts the time that the lights went out in the office as

more than 10 or 15 minutes before the alarm. Royals testifies that he noticed the lights flicker several times and finally go out "just prior to the time the woman hollered 'fire.'" Dreams testified that just a little while before the alarm the lights in the office began to go off and that they would come back, and that "just a few minutes before the alarm was made the lights went out and they never did come back any more." After the alarm was given by Mrs. Dreams, the parties in the office ran to the door, and their evidence varies slightly as to just the location of the fire.

Witness Avara testified, "The fire was on the shed right opposite the transformers."

Dreams testified: "I saw the fire all round the transformers. On the roof of the buildings, all around the transformers. * * * There was a switchboard there and the fire was all around that roof there around the transformers." From his cross-examination we quote:

"Q. And then when you looked out you saw the fire up, you say, on the roof of the grain door mill or planing door mill adjoining the transformers there? A. Yes, sir.

"Q. And you were then, in your best judgment, about two hundred feet away from that place? A. Yes, sir."

On redirect he said:

"A. Why, I went out of the office, grabbed a fire extinguisher and started between where some box cars were split, to go up in the mill, and I saw the fire, raging, sweeping, that was there, saw it, dropped it and turned around and went back and got the car.

"Q. But the question is whether you went in the direction of where the transformer was situated? A. Yes, sir."

The witness Royals testified:

"A. Why, my attention was next directed to the transformer when Harry Dreams' wife came into the side door and hollered that the mill was on fire, and when I ran out of the office up towards the fire—

"Q. Well, now, where was the fire? A. The fire was at the transformer."

Witness Barton, who lived about a quarter of a mile from the lumber company's plant, went over to the plant when he discovered the fire. He testified:

"Q. Well, what did you find when you got there—what was the fire—where was the fire located? A. Well, the building directly in front of the transformers was afire, so was the platform that the transformers were

mounted on, the poles and the wiring leading from the transformers into the building was afire."

The evidence also shows that the wind was blowing in the direction that would have carried the fire from the transformers to the buildings.

These are the outstanding matters appearing in the evidence of the appellees outside of the rebuttal evidence. One expert witness, Osborn, was used in rebuttal, whose testimony will be referred to subsequently. The burden was on appellees to show primarily either by direct or circumstantial evidence that the fire was caused in some way by the power company. Unless that fact is established, there is no foundation on which to place the doctrine of res ipsa loquitur. It is appellees' theory apparently that the evidence was sufficient to warrant the jury in finding that in some way by virtue of a defective transformer or other appliance a flame was engendered that reached the building close to the transformer and caused the fire.

The evidence introduced by appellees in their case in chief, which we have herein reviewed in its important aspects, considered in the light most favorable to appellees' contention, may be said to show that about 1 o'clock of the night of the fire there was a leakage of electricity accompanied by a blue flame at one of the cut-offs above one of the transformers, and that it had charred a place on one of the poles supporting the bank of transformers; that the repair man sent by the power company made only temporary repairs; that Anderson, the foreman of the repair men, stated that the transformers were shot, which means, according to the evidence, that the inside of the transformer becomes a solid mass, and the transformer is useless for its purposes, and dangerous; that, shortly before the alarm of the fire was given, the lights in the office flickered and went out; that the current that conveyed light to the office came on the secondary wires from the bank of transformers; that the transformer insulation was within 18 to 24 inches of the building in the yards of the lumber company; that the fire, when discovered, was in the vicinity of the transformers and around them, and that the wind was blowing from the transformers in the direction of the grain door and planing mill.

It is apparent in the last analysis that the proper legal solution of the controversy is dependent on the relationship of the blue flame seen around the bolt on one of the

poles between 12 and 1 o'clock at night to the fire which destroyed the lumber yard five or six hours later. If the situation concerning the blue flame were out of this case, it could not be seriously contended that there was any evidence whatever on which the case could be submitted to a jury.

It is without controversy that, when the plug was pulled from the fuse cut-out by Dreams, the blue flame on the pole around the bolt went out; and, when the plug was reinserted, the flame reappeared, showing conclusively that the leak was in the fuse cut-out and was a surface leak. This flame was not affected by the chemicals of the fire extinguisher. The evidence establishes, and it is not questioned by appellees, that the transformers and the fuse cut-outs were of a standard kind in general use throughout the country, and recognized as safe construction. The evidence establishes beyond any question that the leak was in the cut-out; the insulation of the cut-out had evidently broken down, and the current had gone through the feeding wire and reached the woodwork, causing the flame. The repair men that night put in a by-pass or jumper. Its function is described by witness Blood, an expert, as follows:

"Q. Are you familiar with what is known as a jumper installation? A. Yes, sir.

"Q. What is the purpose of that, Mr. Blood? A. It is just like a switch on a railroad track; it is placed around any device you wish to cut out; for instance, if you wished to put a jumper on this, these two wires would be cut off and a wire placed around here; then after that has been done the fuse block would be cut out, and the fuse block entirely eliminated from the circuit, and it forms a temporary connection and the current passes through by the path of your jumper."

On the same subject we quote from the witness McKinnon:

"Q. Now, I do not recall if you have told just what putting in a by-pass or jumper did —that is, how do you do it, how did you do it that night, after cutting the wires around the fuse block, then what? A. A jumper is an ordinary piece of line wire, cut in on the line, and to cut out the equipment that is to be cut out.

"Q. And how was the jumper connected up, after you had it in? A. It was connected from the line side of the transformer side of the leads that go into the primary cut-out.

"Q. In other words, was it inserted between, to connect up the two ends of the two wires that you had cut, that went into the fuse block? A. Yes, sir."

The expert, Osborn, introduced by the appellees, admitted that, after the jumper was put on, and assuming that the fuse cut-out was cut out on both sides, there was no current going through the cut-out.

As to the effect the elimination of this particular cut-out had upon the transformers, the expert witness, Morrison, said, in answer to the question of counsel:

"Mr. Hamilton: After that cut-out was eliminated by the cutting of the wires into and leading from it, where did the three transformers receive their protection? A. The transformers then received their protection from the other two cut-outs. On a 3-phase system, only two phases would cut off the current so that lights could not operate for the bank of transformers.

"Q. Only one cut-out being eliminated, was protection still afforded to the other two transformers? A. Full protection, 100% protection.

"Q. By what? A. The other two cut-outs.

"Q. Now after the jumper was installed and this fuse cut-out was eliminated by the cutting of the wires leading thereto and therefrom, was there any chance for a leakage from that particular cut-out? A. There was no chance from that particular cut-out, no more chance than if it had been taken away and put in the storeroom."

There was no current then through the fuse cut-out. It was switched around it, and the leak was gone. There was no more blue flame seen there that night.

It is urged that the flame which set the fire might have come from the transformers. In their brief counsel for appellees say:

"However, according to plaintiffs' testimony, it is not impossible nor improbable for power transformers to break down at the bushings, where these primary wires enter the transformer, either by mechanical injury to the bushing or by water being driven in and wetting the surfaces of the bushings. This condition would result in an electrical connection between the primary wire, carrying the heavy charge of electricity, and the cast-iron tank covering of the transformer, which covering, as shown by the evidence, was not grounded. This would permit a flow of electricity onto the platform supporting the transformers, which platform, if wet, would then become a conductor of electricity.
* * * * * * * * * * * * *

"However, should there be a puncture of the insulation on the wires making up the primary coils there would then result a direct connection between the primary coils and the secondary coils, and thus permit the 2300 volts to pass into the secondary system,

and, according to defendant's witness, Thompson, if the oil contained in the transformer is dissipated in some form the transformer itself would burn and produce a hot fire."

Appellees' expert witness, Osborn, states: "It is not impossible nor improbable for power transformers to break down at the bushings where the primary wires enter the transformers. That can be caused from a number of causes, either mechanical injury, or defective insulation, or water, rain water driving in and wetting the surfaces."

These theories may be true, but there is no evidence on which to base them. The only evidence that there was anything the matter with any transformer was the alleged statement (which he denies) of the witness Anderson that night to Royals that the transformer was shot. Whether he said this or not, the facts show that the transformer could not have been shot. Hence this alleged statement of Anderson does not raise a controverted question of fact. What is meant by this phrase is explained by witness, Thompson, an electrical expert of wide experience, as follows:

"Q. What does a shot transformer mean? A. In common parlance, the word shot transformer means the transformer that has been hit, perhaps, by lightning, or something that has so distorted it, within the tank itself, that it blows out any fuses, anything that is back on that feeder back of it; something has to go."

Creditable witnesses testify without contradiction that, if the transformer had been in trouble, putting the jumper on would not have put out the blue flame; that the 3-phase motor could not have been started; that it would not have been possible to have had the lights continue to burn in the plant; that the transformer could not have been gotten back into action. The evidence shows that, after the fire, the transformers were not blown and no defects therein were ascertained.

According to the evidence of Thompson, if the transformer had been shot, the three cut-outs would have blown out; the circuit breaker at the power house "would either go out or it would be blown up." He testified on cross-examination:

"Q. There are innumerable ways, are there not, in which a transformer such as you see on that blue print (indicating) could become defective—a three-phase transformer of that kind—a bank of transformers? A. There are two ways that I know.

"Q. Only two. What are they? A. One is lightning struck.

"Q. Yes, sir. A. The other is overload to the extent of burning out of a transformer. A dead short circuit."

It appears that witnesses who came to assist in putting out the fire went under the transformer poles and got the buckets; that lines of hose passed between the two poles and under the transformers, and the uncontradicted testimony of the experts was that, if the leak had come from the transformers, the linemen could not have worked around the transformer platform; it would have been too hot. There is no evidence of excess voltage or the blowing out of fuses. There is nothing in this record, except in the surmises of appellees' expert witness, Osborn, to suggest that there was anything whatsoever the matter with the transformers or that any leak existed therein, or that the fire in any way could have been imparted therefrom. There is a suggestion that Anderson's testimony shows a doubt as to whether he had completely removed the danger by the placing of the jumper around the fuse cut-out. He testified on direct examination:

"Q. Now, after the jumper was put on, was there any leak or flame or any trouble of any kind? A. Not visible.

"Q. Well, was there any that you think that was invisible? A. No, I could not tell. I could not see anything.

"Q. In your opinion, was it or was it not all right, after the jumper was put in? A. It was all right, as far as we know, because we started up the motor and it run, and that was all the test we could make."

On redirect he testified that what he wanted to investigate when it was light was the fuse cut-out. This evidence, of course, presents opportunity to infer that there was some leak or invisible flame existing somewhere after the jumper was put in, but it is hardly sufficient to establish anything more than a surmise.

We refer to some of the evidence of appellant as to the location of the fire when discovered in the morning. We have heretofore referred to appellees' evidence on this question.

Witness Poncus Picos testified:

"Well, just before I discovered the fire, I first heard three explosions, pretty close together, one behind the other; that attracted my attention, and noticing, I seen the roof rise on the filing house and the flames burst forth."

He stated that, when the fire got to the transformers, the whole northeast corner of the yard was destroyed.

Mrs. Atkins, formerly Mrs. Dreams, tes-

tified as to the location of the fire in the morning:

"Q. You were in the restaurant at that time? A. I was in the restaurant.

"Q. Yes. And did you see—where did you see the fire, generally? A. It was coming out of the roof.

"Q. Coming out of the roof? A. When I went to the door.

"Q. Whereabouts, roof of what, or where? A. I don't know. It was near there.

"Q. Was it the building, out of a roof of a building in the lumber yard? A. Yes, it was out of a building."

Witness Gillum, assistant chief of the Brooklyn fire department, testified that, when they arrived there, the fire was northeast of the transformers under the big shed, and that they ran one line of hose under the transformers and one line north of them.

Witness Parker testified:

"A. When I got there? Why, the whole yard practically was all ablaze.

"Q. The fire was burning then? A. Yes, sir.

"Q. Whereabouts? A. Whereabouts? In the yard.

"Q. On one of the buildings? A. The whole shed were on fire, practically.

"Q. Do you remember where the transformer poles were located there? A. Do I remember that?

"Q. Yes. A. I saw them.

"Q. You saw them? A. Yes.

"Q. Now, state what, if anything, happened to them after you got there? A. Well, in about fifteen or twenty minutes, to the best of my knowledge, why the fire was getting pretty close to them.

"Q. And then what? A. Then what?

"Q. Yes. A. Well, naturally the posts which they was attached to, they caught fire.

"Q. They caught fire? A. Yes, sir.

"Q. Did they burn? A. Did they burn?

"Q. Yes. A. Yes, sir.

"Q. And were you there when they burned and fell? A. I was there when the posts was burned so that the weight of the transformers fell.

"Mr. Hamilton: That is all."

Witness Moore testifies that, when he got to the fire at 6:30, it had not reached the transformer poles.

Witness Wilson testifies that, when he reached there, "the saw filing room was on fire," and that it was half an hour before the fire spread to where the transformer poles were.

Witness Green testified that, when he got there, the fire had been burning for some time, and was then about 20 or 30 feet from the transformers.

Witness Vines testified there was no fire around transformers or poles.

It appears in the evidence that oil and gasoline were kept on the premises; that there was oily waste, trash, and débris here and there throughout the plant, and that men smoked around the place. Evidently there were many kinds of fire hazards on the premises. There is no evidence whatever in this record showing what caused this fire and no circumstances point clearly to the source thereof. It is just as reasonable or probable that the fire came from other sources as from appellant's electrical appliances. The fire was raging and sweeping when first discovered. The transformer poles were still standing when the northeast corner of the yard was destroyed, and the firemen ran hose under the transformers and between the poles to fight the fire. If a leak had followed the wire into the building with sufficient current to burn the insulation, the testimony shows it would have blown the fuses and put the lights out. The fact that the lights went out some 10 minutes before the fire is consistent with the headway the fire had gained, and that it was far advanced when the lights went out. The electricity could not have set fire to the poles, and the flame from the poles set fire to the building, because the poles stood after the fire had practically destroyed the yards. These buildings were water-soaked, while inside they were dry, and the fire, when discovered, was under full headway. All the facts point to an inside rather than an outside fire. We think the force of uncontradicted evidence eliminates any causal connection between the blue flame at the fuse cut-out and the fire which destroyed the lumber yard. The fact of a leak in a fuse cut-out that had been properly taken care of and eliminated would not warrant a presumption of a leak in other electrical appliances five or six hours thereafter.

The trial court instructed the jury that "the mere fact that a surface leak was seen near these transformers several hours before the fire, would of course not be sufficient evidence to warrant you in finding a verdict for the plaintiff." That is good law.

There is no evidence, however, to connect the power company in any way with the fire except the blue flame aside from the fact that the fire broke out near the transformers and the transformers were near the building. The flame was out of the way four or five hours before the fire. The fact that the transformers were near the build-

ings and that the fire of course must have been in the vicinity of the transformers is not sufficient upon which to base a verdict. Nor is the direction of the wind.

The burden was on appellees to show that the power company was connected in some way with the origin of the fire. That cannot be done merely by inferences, conjectures and guesses, or by assuming that the fire may have been caused by the power company. Evidently, appellees at and immediately subsequent to the time of the fire had no idea that it was caused by the power company's defective appliances, as no claim was made against the power company until approximately 19 months after the fire. To hold appellant responsible here under this evidence is to sustain a verdict which can be founded on nothing more than a guess.

In Minneapolis General Electric Co. v. Cronon, 166 F. 651, 658, 20 L. R. A. (N. S.) 816, this court said: "A plaintiff is required to develop a theory upon which the actionable negligence of the defendant is claimed, and such theory must be supported by tangible evidence. The jury may not be indulged, against visible facts contradicting it, to guess that it was otherwise. The burden of proof ought not to be shifted after such fashion, to enable the plaintiff to recover." Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Kramer v. Mills Lumber Co. (C. C. A.) 24 F.(2d) 313; Waters-Pierce Oil Co. v. Van Elderen (C. C. A.) 137 F. 557, 570; Broudy v. Detroit, J. & C. Ry., 184 Mich. 330, 151 N. W. 575; Bergeler v. Waukesha Gas & Electric Co., 165 Wis. 68, 160 N. W. 1076.

We are clearly of the opinion, after a careful examination of the entire evidence, that it was totally insufficient to submit the case to the jury, and that the motion made at the close of all the testimony for an instructed verdict for defendant should have been sustained. The judgment is reversed and the case remanded for further proceedings in harmony with this opinion.

Reversed and remanded.